**BURSOR & FISHER, P.A.**
Philip L. Fraietta (State Bar No. 354768)
50 Main Street, Suite 475
White Plains, NY 10606
Telephone: (914) 874-0708
Facsimile:  (914) 206-3656
Email: pfraietta@bursor.com

*Attorney for Plaintiff*

*[Additional counsel listed on the signature page]*

### UNITED STATES DISTRICT COURT

### SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN DOE, individually and on behalf of all other persons similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>JEFF ENGEL, ERIN LAVIGNA, TIMOTHY CIRAOLO, LAUREN HEDGPETH, SEAN HLAVAC, SANDRA PHILLIPS, JENNIFER LAWRENCE, KIM KENNEDY, HALLIE JOHNSON, and HALLIE JACOBS,<br><br>Defendants. | Case No.  **'25CV2429 JES  VET**<br><br>CLASS ACTION<br><br>**JURY TRIAL DEMANDED** |

CLASS ACTION COMPLAINT

Plaintiff John Doe, brings this Class Action Complaint ("Complaint") on behalf of himself and all others similarly situated (the "Class Members") against Jeff Engel, Erin Lavigna, Timothy Ciraolo, Lauren Hedgpeth, Sean Hlavac, Sandra Philips, Jennifer Lawrence, Kim Kennedy, Hallie Johnson, and Hallie Jacobs (collectively, the "Defendants"). The allegations contained in this Complaint are based on Plaintiff's personal knowledge of facts pertaining to himself and upon information and belief, including further investigation conducted by Plaintiff's counsel.

## NATURE OF THE ACTION

1.      Plaintiff brings this class action lawsuit on behalf of all California citizens to address Defendants' practice of enabling unauthorized third parties, including, inter alia, Meta Platforms, Inc. ("Meta"); Google LLC ("Google"); and Fullstory, Inc. ("Fullstory") (collectively, the Third Parties), to intercept Plaintiff's and Class Members' confidential, health-related communications with their medical provider, the University of California, San Diego Health ("UCSD Health").

2.      When patients, including Plaintiff and Class Members, communicated with UCSD Health via UCSD Health's owned and operated websites, software and mobile applications, and other online platforms, including the website https://health.ucsd.edu/ and its related patient portal (collectively, the "Website"), the communications contained therein were intercepted and disclosed to unauthorized third parties as a result of the analytics and tracking tools Defendants embedded in the source code of the Website.

3.      Defendants are or were employees of UCSD Health, and were responsible, in various forms and capacities, for implementing, embedding, or installing analytics and tracking tools on the Website, at the direction of their employer, UCSD Health.

4.      UCSD Health encourages patients to use the Website for accessing medical care, such as booking medical appointments, locating physicians and

CLASS ACTION COMPLAINT

treatment facilities, communicating medical symptoms, searching medical conditions and treatment options, signing up for events and classes, and more.

5.     Plaintiff and other Class Members who used the Website believed they were communicating only with their trusted health care provider. Unbeknownst to Plaintiff and Class Members, however, the Website's source code contained analytics and tracking software ("Tracking Code"), which surreptitiously tracked and transmitted Plaintiff's and Class Members' online activity (such as button clicks, keystrokes, and page views) and communications (including intimate details about their medical treatment and appointments, including protected health information and personally identifiable information) to third parties via the Tracking Code.

6.     Accordingly, Plaintiff seeks to remedy these harms and bring a cause of action for Defendants' violation of the Federal Wiretap Act, 18 U.S.C. § 2510, *et seq.* and invasion of privacy under California's constitution.

## JURISDICTION AND VENUE

7.     The Court has jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. §§ 1332(a), 1332(d)(2). The amount in controversy exceeds $5,000,000, exclusive of interest and costs, and there are more than 100 members of the Nationwide Class and the California Class, and there is minimal diversity.

8.     The Court has personal jurisdiction over each Defendant because, upon information and belief, each Defendant resides in California and/or is employed by the UCSD Health, a California entity. Moreover, upon information and belief, each Defendant engaged in the wrongful conduct alleged in California.

9.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiff's claims occurred in this District. Further, Defendants reside in this District.

CLASS ACTION COMPLAINT

# THE PARTIES

*Plaintiff*

10.     Plaintiff John Doe is an adult citizen of the state of California and is domiciled in San Diego County, California.

*Defendants*

11.     At relevant times, Defendant Jeff Engel was a programmer/application analyst at UCSD Health, whose job responsibilities included, *inter alia*, programming work related to the UCSD Health Website, including programming Tracking Code on the Website (including the Website's patient portal). At relevant times, Defendant Engel was acting within the scope of his employment in connection with the installation, integration, embedding and use of Tracking Code on the Website. Plaintiff brings suit against Defendant Engel in his individual capacity.

12.     At relevant times, Defendant Erin Lavigna was the Marketing and Brand Management Executive Director at UCSD Health, whose job responsibilities included, *inter alia*, participating in or supervising the development of advertising campaigns, overseeing marketing and the marketing team at UCSD Health and working with others to determine advertisement placements, data collection and metrics with respect to the Website. At relevant times, Defendant Lavigna was acting within the scope of her employment in connection with the installation, integration, embedding and use of Tracking Code on the Website. Plaintiff brings suit against Defendant Lavigna in her individual capacity.

13.     At relevant times, Defendant Timothy Ciraolo was the Website Operations Director at UCSD Health, whose job responsibilities included, *inter alia*, overseeing the planning, development, implementation and governance of the Website; overseeing the Tracking Code installed, integrated, embedded and used in connection with the Website; and managing the Website Marketing Team, including the Marketing Team's installation, integration, embedding and use of Tracking Code

3

in connection with the Website. At relevant times, Defendant Ciraolo was acting within the scope of his employment in connection with the installation, integration, embedding and use of Tracking Code on the Website. Plaintiff brings suit against Defendant Ciraolo in his individual capacity.

14.    At relevant times, Defendant Lauren Hedgpeth was the Marketing and Advertising Director at UCSD Health, whose job responsibilities included, *inter alia*, participating in the development of advertising campaigns, including Website advertising campaigns; overseeing marketing and the Marketing Team at UCSD Health; and working with others to determine advertisement placements, data collection and metrics with respect to the Website. At relevant times, Defendant Hedgpeth was acting within the scope of her employment in connection with the installation, integration, embedding and use of Tracking Code on the Website. Plaintiff brings suit against Defendant Hedgpeth in her individual capacity.

15.    At relevant times, Defendant Sean Hlavac was the Director of Digital Experience at UCSD Health, whose job responsibilities included, *inter alia*, working with the Marketing Team at UCSD Health to shape search engine marketing and search engine optimization strategies in connection with the Website and participating in Website content creation for advertising campaigns. At relevant times, Defendant Hlavac was acting within the scope of his employment in connection with the installation, integration, embedding and use of Tracking Code on the Website. Plaintiff brings suit against Defendant Hlavac in his individual capacity.

16.    At relevant times, Defendant Sandra Phillips was the Marketing Content Strategy Director at UCSD Health, whose job responsibilities included, *inter alia*, managing organic and boosted content on social media channels, working with the Marketing Team and others at UCSD Health to determine advertisement placements, data collection and metrics with respect to the Website.  At relevant times, Defendant Phillips was acting within the scope of her employment in connection with the

CLASS ACTION COMPLAINT

installation, integration, embedding and use of Tracking Code on the Website. Plaintiff brings suit against Defendant Phillips in her individual capacity.

17.   At relevant times, Defendant Jennifer Lawrence was the Associate Director of Marketing at UCSD Health, whose job responsibilities included, *inter alia*, overseeing marketing and the Marketing Team at UCSD Health; supervising the development of advertising campaigns, including Website-related advertising campaigns; and working with others to determine advertisement placements, data collection and metrics with respect to the Website. At relevant times, Defendant Lawrence was acting within the scope of her employment in connection with the installation, integration, embedding and use of Tracking Code on the Website. Plaintiff brings suit against Defendant Lawrence in her individual capacity.

18.   At relevant times, Defendant Kim Kennedy was the Chief Marketing and Communications Officer at UCSD Health, whose job responsibilities included, *inter alia*, participating in or supervising the development of advertising campaigns, including Website-related advertising campaigns; overseeing marketing and the Marketing Team at UCSD Health; and working with others to determine advertisement placements, data collection and metrics with respect to the Website. At relevant times, Defendant Kennedy was acting within the scope of her employment in connection with the installation, integration, embedding and use of Tracking Code on the Website. Plaintiff brings suit against Defendant Kennedy in her individual capacity.

19.   At relevant times, Defendant Hallie Johnson was a Senior Marketing Manager at UCSD Health, whose job responsibilities included, *inter alia*, participating in the development of advertising campaigns, including Website-related advertising campaigns; overseeing marketing and the Marketing Team at UCSD Health; and working with others to determine advertisement placements, data collection and metrics with respect to the Website. At relevant times, Defendant Johnson was acting

CLASS ACTION COMPLAINT

within the scope of her employment in connection with the installation, integration, embedding and use of Tracking Code on the Website. Plaintiff brings suit against Defendant Johnson in her individual capacity.

20.     At relevant times, Defendant Hallie Jacobs was a Social Media Specialist at UCSD Health, whose responsibilities included, *inter alia*, managing organic and boosted content on social media channels, working with the Marketing Team at UCSD Health and collaborating with others to determine advertisement placements, data collection and metrics with respect to the Website. At relevant times, Defendant Jacobs was acting within the scope of her employment in connection with the installation, integration, embedding and use of Tracking Code on the Website. Plaintiff brings suit against Defendant Jacobs in her individual capacity.

## FACTUAL ALLEGATIONS

### A.    Background of the Federal Wiretap Act

21.     The original Federal Wiretap Act was enacted in 1934 "as a response to Fourth Amendment concerns surrounding the unbridled practice of wiretapping to monitor telephonic communications."[1]

22.     The Wiretap Act primarily concerned the government's use of wiretaps, but Congress grew concerned that technological advancements like "large-scale mail operations, computer-to-computer data transmissions, cellular and cordless telephones, paging devices, and video teleconferencing" were rendering the Wiretap Act out of date. S. Rep. No. 99-541, at 2 (1986). Thus, in 1986, Congress amended the Wiretap Act through the Electronic Communications Privacy Act ("ECPA") to provide a private right of action for private sector intrusions as though they were government intrusions.[2]

---

[1] Hayden Driscoll, *Wiretapping the Internet: Analyzing the Application of the Federal Wiretap Act's Party Exception Online*, 29 WASH. & LEE J. C.R. & SOC. JUST. 187, 192 (2022).

[2] *Id.*

CLASS ACTION COMPLAINT

23.     Title I of the ECPA amended the Wiretap Act such that a violation occurs when a person or entity: (i) provides an electronic communication service to the public; and (ii) intentionally divulges the contents of any communication; (iii) while the communication is being transmitted on that service; (iv) to any person or entity other than the intended recipient of such communication.

24.     While the ECPA allows a single party to consent to the interception of an electronic communication, single party consent is only acceptable where the communication is not "intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C. § 2511(2)(d).

**B.      The UCSD Health Website**

25.     UCSD Health owns and operates the Website and provides patients with a platform to manage their health. Defendants, as employees of UCSD Health, and at the direction of UCSD Health, have purposefully integrated and embedded Meta's, Google's, and Fullstory's software into the Website to track patients' actions on the Website. Through this action, Defendants have aided the Third Parties in intercepting UCSD Health patients' communications containing protected health information ("PHI") and personally identifiable information ("PII") (PHI, PII, and communications related to PHI and PII known collectively as "Private Information"). The following describes the way in which the Meta, Google, and Fullstory software operates and intercepts patient communications on the Website. Plaintiff's and Class Members' communications were intercepted by Meta, Google, and Fullstory in the same manner described below.

**C.      The U.S. Department of Health and Human Services and Federal Trade Commission Have Warned about Use of Tracking Tools by Healthcare Providers**

26.     Considering tracking technology like those Defendants implemented on the Website, the U.S. Department of Health and Human Services ("HHS") issued a

CLASS ACTION COMPLAINT

bulletin instructing regulated entities like Defendants' employer, UCSD Health, to only use such software in an extremely limited function:

> **Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules**. For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures of [electronic protected health information] to tracking technology vendors or any other violations of the HIPAA Rules.[3]

27.    In other words, HHS has expressly stated that entities like UCSD Health, that implement (as done by and through the Defendants here) the Meta Pixel, and other similar technologies like Google Analytics, and Fullstory Session Replay, have violated HIPAA Rules unless those entities obtain a HIPAA complaint authorization.

28.    The HHS Bulletin further warns that:

> While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, **because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI only as expressly permitted or required by the HIPAA Privacy Rule.**[4]

29.    Additionally, HHS has warned healthcare providers that Protected Information is not limited exclusively to patient portals like MyChart, and that

---

[3] *See Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, U.S. Dep't of Health and Hum. Servs. (Dec. 1, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-onlinetracking/index.html (emphasis added).

[4] *Id. (*emphasis added).

CLASS ACTION COMPLAINT

providers like UCSD Health still have an obligation to protect information on nonpassword protected pages or unauthenticated pages:

> Tracking technologies on a regulated entity's unauthenticated webpage that addresses specific symptoms or health conditions, such as pregnancy or miscarriage, or that permits individuals to search for doctors or schedule appointments without entering credentials may have access to PHI in certain circumstances. For example, tracking technologies could collect an individual's email address and/or IP address when the individual visits a regulated entity's webpage to search for available appointments with a health care provider. In this example, the regulated entity is disclosing PHI to the tracking technology vendor, and thus the HIPAA Rules apply.[5]

**D.    Meta's Business Tools**

30.    Facebook, owned by Meta, describes itself as a "real identity platform,"[6] meaning users are allowed only one account and must share "the name they go by in everyday life."[7] To that end, when creating an account, users must provide their first and last name, along with their birthday and gender.[8]

31.    In 2024, Meta generated over $164 billion in revenue.[9] With respect to the software and mobile applications offered by Meta, substantially all of Meta's revenue is generated by selling advertising space.[10]

---

[5] *Id.* (emphasis added).

[6] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021).

[7] META, *Names Allowed on Facebook*, https://www.facebook.com/help/229715077154790/.

[8] FACEBOOK, SIGN UP, https://www.facebook.com.

[9] META, META ANNUAL REPORT 2024, https://d18rn0p25nwr6d.cloudfront.net/CIK-0001326801/a8eb8302-b52c-4db5-964f-a2d796c05f4b.pdf at 87.

[10] *Id.* at 6.

32.    Meta sells advertising space by highlighting its ability to target users.[11] Meta can target users so effectively because it surveils user activity both on and off its site.[12] This allows Meta to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "connections."[13] Meta compiles this information into a generalized dataset called "Core Audiences," which allows advertisers to reach precise audiences based on specified targeting types.[14]

33.    Advertisers can also build "Custom Audiences."[15] Custom Audiences enables advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[16] With Custom Audiences, advertisers can target existing customers directly, and they can also build "Lookalike Audiences," which "leverage[] information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[17] Unlike Core Audiences, advertisers can build Custom Audiences and Lookalike Audiences only if they first supply Meta with the underlying data. They can do so through two mechanisms: by manually

---

[11] META, WHY ADVERTISE ON FACEBOOK, INSTAGRAM AND OTHER META TECHNOLOGIES, https://www.facebook.com/business/help/205029060038706.

[12] META, ABOUT META PIXEL, https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

[13] META, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

[14] https://www.facebook.com/business/news/Core-Audiences.

[15] META, ABOUT CUSTOM AUDIENCES, https://www.facebook.com/business/help/744354708981227?id=2469097953376494.

[16] META, AD TARGETING, HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

[17] META, ABOUT LOOKALIKE AUDIENCES, https://www.facebook.com/business/help/164749007013531?id=401668390442328.

CLASS ACTION COMPLAINT

uploading contact information for customers or by utilizing Meta's "Business Tools."[18]

34.    As Meta puts it, the Business Tools "help website owners and publishers, app developers, and business partners, including advertisers and others, integrate and share data with Meta, understand and measure their products and services, and better reach and serve people who might be interested in their products and services."[19] Put more succinctly, Meta's Business Tools are bits of code that advertisers can integrate into their websites, mobile applications, and servers, thereby enabling Meta to intercept and collect user activity on those platforms.

35.    The Business Tools are automatically configured to capture certain data, like when a user visits a webpage, that webpage's Universal Resource Locator ("URL") and metadata, or when a user downloads a mobile application or makes a purchase.[20] Meta's Business Tools can also track other events. Meta offers a menu of "standard events" from which advertisers can choose, including what content a visitor views or purchases.[21] Advertisers can even create their own tracking parameters by building a "custom event."[22]

---

[18] META, CREATE A CUSTOMER LIST CUSTOM AUDIENCE, https://www.facebook.com/business/help/170456843145568?id=2469097953376494; FACEBOOK, CREATE A WEBSITE CUSTOM AUDIENCE, https://www.facebook.com/business/help/1474662202748341?id=2469097953376494.

[19] META, THE META BUSINESS TOOLS, https://www.facebook.com/help/331509497253087.

[20] See META, META FOR DEVELOPERS: META PIXEL, ADVANCED, https://developers.facebook.com/docs/meta-pixel/advanced/; see also FACEBOOK, BEST PRACTICES FOR META PIXEL SETUP, https://www.facebook.com/business/help/218844828315224?id=1205376682832142; FACEBOOK, META FOR DEVELOPERS: MARKETING API - APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

[21] META, SPECIFICATIONS FOR META PIXEL STANDARD EVENTS, https://www.facebook.com/business/help/402791146561655?id=1205376682832142.

[22] META, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005?id=1205376682832142

---

11

36.    One such Business Tool is the Meta Pixel. Meta offers this piece of code to advertisers, like UCSD Health, to integrate into their website. The Meta Pixel "tracks the people and type of actions they take."[23] When a user accesses a website hosting the Meta Pixel, Meta's software script surreptitiously directs the user's browser to contemporaneously send a separate message to Meta's servers. This second secret and contemporaneous transmission contains the original GET request sent to the host website, along with additional data that the Meta Pixel is configured to collect. This transmission is initiated by Meta code and concurrent with the communications with the host website. At relevant times, two sets of code were thus automatically run as part of the browser's attempt to load and read the UCSD Health' Website—UCSD Health's own code and Meta's embedded code.

37.    An example illustrates the point. Take an individual who, at relevant times, navigated to the Website and clicked on a link for fertility care information. When that link was clicked, the individual's browser sent a GET request to UCSD Health's server requesting that server to load the particular webpage. As a result of the Meta Pixel on the Website, written in JavaScript, sent secret instructions back to the individual's browser, without alerting the individual that this was happening. Meta caused the browser to secretly duplicate the communication with the UCSD Health, transmitting it to Meta's servers, alongside additional information that transcribed the communication's content and the individual's identity.

38.    After collecting and intercepting the information described in the preceding paragraph, Meta processed it, analyzed it, and assimilated it into datasets like Core Audiences and Custom Audiences. In order to engage in the above-described processing, analysis and assimilation, on information and belief, Meta had to view the

---

; *see also* FACEBOOK, META FOR DEVELOPERS: MARKETING API – APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

[23] META, RETARGETING, https://www.facebook.com/business/goals/retargeting.

CLASS ACTION COMPLAINT

information being processed, analyzed and assimilated. Therefore, it follows that Meta regularly and necessarily viewed and used health information collected and/or intercepted from Plaintiff and Class Members via the Meta Pixel.

39.    Further, once Meta intercepts users' communications on the Website, Meta has the ability to use the intercepted information for its own purposes beyond recording the information for UCSD Health. Meta benefits from the information it collects from its clients' websites because Meta uses this information to improve its advertising network, including its machine-learning algorithms and its ability to target users with ads.[24]

### E.    Google's Platform and Its Business Tools

40.    Google offers a range of advertising software, one of which is called Google Analytics.

41.    "Google Analytics is a platform that collects data from [] websites and apps to create reports that provide insights" for businesses.[25] This is made possible by Google Analytics, a piece of code installed on a website or app that collects information on how website and app users interact with a business's website, including "how many users bought an item . . . by tracking whether they made it to the purchase-confirmation page."[26]

42.    Google advertises that this service can "[m]onitor activity on your site as it happens."[27]

---

[24] META, PRIVACY POLICY, https://www.facebook.com/privacy/policy/.

[25] GOOGLE, HOW GOOGLE ANALYTICS WORKS, https://support.google.com/analytics/answer/12159447?hl=en&ref_topic=14089939&sjid=2827624563183915220-NC.

[26] *Id.*

[27] GOOGLE, THE FINER POINTS, https://marketingplatform.google.com/about/analytics/features/.

CLASS ACTION COMPLAINT

43.    Google's business model involves entering into voluntary partnerships with various companies and surveilling communications on their partners' websites with Google Analytics.

44.    Thus, through websites and software and mobile applications that employ Google's services, Google directly receives the electronic communications of website visitors entered into websites via website and app features like search bars.

45.    That information is then analyzed by Google before it is provided to any entity that was a party to the conversation (like UCSD Health). In order to conduct this analysis, Google, on information and belief, views the information.

46.    Once Google intercepts website or app communications, it has the capability to use such information for its own purposes. "Google uses the information shared by sites and apps to deliver [] services, maintain and improve them, develop new services, measure the effectiveness of advertising, protect against fraud and abuse, and personalize content and ads you see on Google and on [] partners' sites and apps."[28]

47.    Google's range of software services is based on Google's ability to collect and analyze information about consumers' web behavior and deliver targeted advertising to select consumers based on their web habits. This involves collecting visitor information from thousands of websites and then analyzing that information in order to group web users so they can be targeted for products or services based on their interests.

48.    In order to engage in analyzing the collected data to deliver targeted advertising, Google, on information and belief, regularly viewed and used the sensitive health information collected by the Google Analytics code. As such, on information

---

[28] GOOGLE, GOOGLE PRIVACY AND TERMS,
https://policies.google.com/technologies/partner-sites.

CLASS ACTION COMPLAINT

and belief, Google regularly viewed and used Plaintiff's and Class Members' health information collected and/or intercepted via Google Analytics.

49.    Information from websites and software and mobile applications, like the Website, is central to Google's ability to successfully market its advertising capabilities to future clients.

50.    In sum, Google has the capability to use website and software and mobile application communications to: (a) improve its own products and services; (b) develop new Google for Business and Google Analytics products and services; and (c) analyze website visitors' communications to assist with and data analytics and targeted advertising.

51.    Further, Defendants, through the direction of UCSD Health, share information with Google that amounts to PII via its collection of device identifiers and IP addresses. Device identifiers and IP addresses are types of information that the U.S. Department of Health and Human Services lists as information that should be removed to de-identify a patient in compliance with the HIPAA.[29] Google uses IP addresses and unique device identifiers to track internet users. Therefore, Defendants, through the direction of UCSD Health, allow the interception of, and otherwise discloses, both PHI and PII to Google as described below.

52.    Yet another type of PII obtained from Website users by Google, and subsequently viewed by Google, is what data companies refer to as a "browser-fingerprint." A browser-fingerprint is information collected about a computing device that can be used to identify the specific device.

---

[29] U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, GUIDANCE REGARDING METHODS FOR DE-IDENTIFICATION OF PROTECTED HEALTH INFORMATION IN ACCORDANCE WITH THE HEALTH INSURANCE PORTABILITY AND ACCOUNTABILITY ACT (HIPAA) PRIVACY RULE, https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html#standard.

CLASS ACTION COMPLAINT

53.    These browser-fingerprints provide a wide variety of data and can be used to uniquely identify individual users when a computing device's IP address is hidden or cookies are blocked. As Google explained, "[w]ith fingerprinting, developers have found ways to use tiny bits of information that vary between users, such as what device they have or what fonts they have installed to generate a unique identifier which can then be used to match a user across websites."[30] The value of browser-fingerprinting to advertisers (and trackers who want to monetize aggregated data) is that it can be used to track website users just as cookies do, but it employs much more subtle techniques.[31] Additionally, unlike cookies, users cannot clear their fingerprint and, therefore, cannot control how their personal information is collected.[32]

54.    In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users. [33]

55.    Browser-fingerprints are personal identifiers, and Tracking Code can collect browser-fingerprints from website visitors.

56.    Defendants use and cause the disclosure of data sufficient for third parties, like Google, to create a browser-fingerprint identifier with each re-directed communication described herein.

**F.    Google's Floodlight Conversion Tracking System**

57.    Google also offers a marketing platform that creates a "unified advertising and analytics platform for smarter marketing and better results."[34] As part

---

[30] GOOGLE, BUILDING A MORE PRIVATE WEB, https://www.blog.google/products/chrome/building-a-more-private-web/.

[31] Chris Hauk, *What is Browser Fingerprinting? How it Works and How to Stop it*, https://pixelprivacy.com/resources/browser-fingerprinting/.

[32] *Supra* note 37.

[33] Yinzhi Cao, Song Li & Erik Wijmans, *(Cross-)Browser Fingerprinting via OS and Hardware Level Features*, https://www.ndss-symposium.org/ndss2017/ndss-2017-programme/cross-browser-fingerprinting-os-and-hardware-level-features/.

[34] GOOGLE MARKETING PLATFORM, https://marketingplatform.google.com/about/.

CLASS ACTION COMPLAINT

of its platform, Google offers the Floodlight Conversion Tracking System which "consist[s] of tags that track activity on [a] site, along with reporting features for adding conversion data to [] reports."[35] Floodlight works by tracking a "Floodlight activity," which is a "specific conversion" a website or software or mobile application owner wants to track "such as . . . a visit to a page on [a] site."[36] Once a visitor conducts the tracked activity, a website tag reports the conversion to Floodlight.[37]

58.    Floodlight uses "a cookie to recognize repeat visits from a specific browser."[38] Through the use of cookies, Google's advertising services, like Floodlight, can provide "personalized advertising" to an individual based on their actions on websites and software and mobile applications.[39]

59.    A website or software or mobile application owner can also use Floodlight in a way that allows the "information associated with cookies used in advertising [to] be added to the user's Google Account."[40] Therefore, the cookies used for the Floodlight services are PII because they can be connected to a particular individual's Google Account.

### G.    Fullstory's Session Replay

60.    Fullstory's Session Replay software is an analytics tool embedded into a website via code that is used to reproduce a "user's interactions on a website or web application exactly how the user experienced it. Session replay transforms logged user

---

[35] GOOGLE, REPORT ON FLOODLIGHT CONVERSIONS, https://support.google.com/searchads/answer/7298761?hl=en&ref_topic=6054260&sjid=11536244677443819800-NC

[36] *Id.*

[37] *Id.*

[38] *Id.*

[39] GOOGLE, HOW GOOGLE MARKETING PLATFORM ADVERTISING PRODUCTS AND GOOGLE AD MANAGER USE COOKIES, https://support.google.com/searchads/answer/2839090?sjid=11536244677443819800-NC.

[40] *Id.*

events, such as mouse movements, clicks, page visits, scrolling, tapping, etc., into a reproduction of what the user actually did on the site or app."[41]

61.    Since Fullstory's Session Replay software logs all activity a user takes on an online platform, this includes any information the user enters into a website, such as things a user types into a website's search fields. Thus, Fullstory's Session Replay software can intercept communications website users type into a website, including PHI and PII.

62.    Technology like the Fullstory Session Replay feature is not only highly intrusive, but dangerous. A 2017 study by Princeton University found that session replay technologies were collecting sensitive user information such as passwords and credit card numbers.[42] The research notes that this was not simply the result of a bug, but rather insecure practices.[43] Thus, session replay technologies, such as Fullstory's, leave users vulnerable to data leaks and the harm resulting therefrom.

63.    Fullstory, itself, notes that a challenge with using session replay software is ensuring the exclusion of the collection of sensitive data by choosing a session replay tool that "provide[s] for both the exclusion of sensitive data from being collected . . . and the ability to mask user inputs from view in a session replay.[44] While Fullstory's Session Reply software provides for these precautionary functions, they are not automatic. Even Fullstory's Private by Default setting, which "automatically masks all text elements except ones that are specifically allowlisted" [sic] is a setting that must be enabled.[45] Therefore, when a website operator uses Fullstory's Session

---

[41] https://www.fullstory.com/blog/session-replay/.

[42] Steven Englehardt, *No boundaries: Exfiltration of personal data by session-reply scripts*, (Nov. 15, 2017) https://freedom-to-tinker.com/2017/11/15/no-boundaries-exfiltration-of-personal-data-by-session-replay-scripts/.

[43] *Id.*

[44] https://www.fullstory.com/blog/session-replay/#session-replay-and-privacy.

[45] *Id.*

CLASS ACTION COMPLAINT

Replay software, it places users at risk of having their PHI and PII shared with Fullstory.

64.    Thus, through websites that employ Fullstory's Session Replay software, such as the Website, Fullstory directly receives the recording of each website visit, including the electronic communications website visitors entered into search bars, chat boxes, and online quizzes, in real time.

65.    Fullstory's embedded JavaScript code operates within users' browsers, tracking their interactions (*e.g.*, clicks, scrolls, typing, and other input data) on the website within which the code is embedded without the users' knowledge and transmitting the information to Fullstory's servers, along with additional context about the session. In this manner, Fullstory effectively obtains a recorded replay of the users' experiences on the website. The data transmission described herein occurs concurrently with each user's activity, enabling Fullstory to intercept sensitive data as it is generated. In other words, Fullstory's interception of users' communications on a website occurs "in transit."

66.    When integrated and embedded into a website, Fullstory Session Replay software is not akin to a tape recorder or a "tool" used by one party to simply record the other. Instead, it involves Fullstory, a separate and distinct third-party entity from the parties in the conversation, using the Fullstory Session Replay software to eavesdrop on, record, extract information from, and analyze a conversation to which it is not a party. This is so because Fullstory itself is collecting the content of any conversation. That information is then analyzed by Fullstory before being provided to any entity that was a party to the conversation.

67.    Once Fullstory intercepts communications from a website, it has the ability to use such information for its own purposes. Fullstory's privacy policy acknowledges that it uses information collected from website users, meaning "a visitor

CLASS ACTION COMPLAINT

to a website that uses the Fullstory Services or a client of a Fullstory Customer"[46] to "[m]onitor the performance of [Fullstory's] Services" and "[m]anage, operate, and improve the Services and grow [its] business."[47] Therefore, Fullstory uses data collected from the Website for its own purposes.

### H. How Defendants Disclosed Plaintiff's and Class Members' Protected Health Information and Assisted With Intercepting Communications

68.    Through the Third Parties' software, which Defendants installed, integrated, and embedded into the Website, Defendants shared UCSD Health patients' identities and online activity, including information and search results related to their private medical treatment.

69.    For example, when a patient entered the Website and searched for a doctor, the patient could search by name, specialty, condition, or location and, on information and belief, Defendants, through the Tracking Code, assisted with the interception of, and otherwise transmitted those terms to unauthorized third parties, including Facebook, Google, and Fullstory. For instance, if a patient searched for "pregnant," on information and belief, that exact text query was intercepted by, or otherwise disclosed to, unauthorized third parties, including Facebook, Google, and Fullstory, in the form of a full-string, detailed URL. Likewise, when patients viewed their test results on the Website, on information and belief, the Tracking Code allowed the interception and/or disclosure those communications and activities to unauthorized third parties, including Facebook, Google, and Fullstory.

70.    The following are examples of such full-string, detailed URLs from the Website:

https://health.ucsd.edu/Pages/search.aspx?verticalUrl=Professionals.html&query=Cancer;

---

[46] https://www.fullstory.com/legal/privacy-policy/

[47] *Id.*

CLASS ACTION COMPLAINT

https://health.ucsd.edu/pages/search.aspx?verticalUrl=Professionals.html&query=Dermatology; https://health.ucsd.edu/request_appt/video-visits/pages/express-care-video.aspx.

71.    These full-string, detailed URLs contain PHI. For example, the first listed URL, https://health.ucsd.edu/Pages/search.aspx?verticalUrl=Professionals.html&query=Cancer, informs third parties who receive the URL that the patient who navigated to this page on UCSD Health's Website was attempting to search for medical care by finding a health care professional specializing in cancer.

72.    Each time Defendants assisted with the interception of, or otherwise disclosed, Website users' communications to unauthorized third parties, they also disclosed a patient's PII, including their Facebook ID ("FID"). A FID is a unique and persistent identifier that Facebook assigns to each user. With it, any ordinary person can look up the user's Facebook profile and name. Notably, while Facebook can easily identify any individual on its Facebook platform with only their unique FID, so too can any ordinary person who comes into possession of an FID. Facebook admits as much on its website.[48] Indeed, ordinary persons who come into possession of the FID can connect to any Facebook profile.

73.    A user who accessed the Website while logged into Facebook transmitted what is known as a "c-user cookie" to Facebook, which contained that user's unencrypted Facebook ID.

74.    When a visitor's browser had recently logged out of an account, Facebook compelled the visitor's browser to send a smaller set of cookies.

---

[48] META, *How usernames and user IDs are used on Facebook profiles*, https://www.facebook.com/help/211813265517027?locale=en_GB.

CLASS ACTION COMPLAINT

75.    One such cookie was the "fr cookie" which contained, at least, an encrypted Facebook ID and browser identifier.[49] Facebook, at a minimum, used the fr cookie to identify users.[50]

76.    If a visitor had never created an account, an even smaller set of cookies was transmitted.

77.    At each stage, Defendants also utilized the "_fbp cookie," which attached to a browser as a first-party cookie, and which Facebook used to identify a browser and a user.[51]

78.    The c-user cookie expires after 90 days if the user checked the "keep me logged in" checkbox on the website.[52] Otherwise, the c-user cookie is cleared when the browser exits.[53]

79.    The fr cookie expires after 90 days unless the visitor's browser logs back into Facebook.[54] If that happens, the time resets, and another 90 days begins to accrue.[55]

80.    The _fbp cookie expires after 90 days unless the visitor's browser accesses the same website.[56] If that happens, the time resets, and another 90 days begins to accrue.[57]

---

[49] DATA PROTECTION COMMISSIONER, FACEBOOK IRELAND LTD, REPORT OF RE-AUDIT (Sept. 21, 2012), http://www.europe-v-facebook.org/ODPC_Review.pdf.

[50] FACEBOOK, PRIVACY CENTER – COOKIES POLICY, https://www.facebook.com/privacy/policies/cookies/?subpage=subpage-1.3.

[51] Id.

[52] Seralthan, FACEBOOK COOKIES ANALYSIS (Mar. 14, 2019), https://techexpertise.medium.com/facebook-cookies-analysis-e1cf6ffbdf8a.

[53] Id.

[54] See id.

[55] Confirmable through developer tools.

[56] FACEBOOK, PRIVACY CENTER – COOKIES POLICY, https://www.facebook.com/privacy/policies/cookies/?subpage=subpage-1.3.

[57] Also confirmable through developer tools.

81.    The Meta Pixel used both first- and third-party cookies. A first-party cookie is "created by the website the user is visiting"—*i.e.*, the Website.[58] A third-party cookie is "created by a website with a domain name other than the one the user is currently visiting"—*i.e.*, Meta.[59] The _fbp cookie was always transmitted as a first-party cookie. A duplicate _fbp cookie was sometimes sent as a third-party cookie, depending on whether the browser had recently logged into Facebook.

82.    Meta, at a minimum, used the fr, _fbp, and c_user cookies to link to Facebook IDs and corresponding Facebook profiles. Defendants sent these identifiers alongside the event data.

83.    Plaintiff and Class Members never consented, agreed, authorized, or otherwise permitted Defendants to allow the interception of, or otherwise disclose, their Private Information. Plaintiff and Class Members were never provided with any written notice that Defendants allowed the interception of, or otherwise disclosed, the Private Information of users of the Website, nor were they provided any means of opting out of such disclosures. Defendants nonetheless knowingly allowed the interception of, and otherwise disclosed, Plaintiff's and Class Members' PII and PHI and confidential communications to Meta.

84.    By law, Plaintiff and Class Members are entitled to privacy in their Private Information and confidential communications. Defendants deprived Plaintiff and Class Members of their privacy rights when Defendants: (a) implemented a system that surreptitiously tracked, recorded, and allowed the interception of, and otherwise disclosed, Plaintiff's and Class Members' Private Information; (b) allowed the interception of, and otherwise disclosed, Plaintiff's and Class Members' confidential

---

[58] PC MAG, FIRST-PARTY COOKIE, https://www.pcmag.com/encyclopedia/term/first-party-cookie.  This is confirmable by using developer tools to inspect a website's cookies and track network activity.

[59] PC MAG, THIRD-PARTY COOKIE, https://www.pcmag.com/encyclopedia/term/third-party-cookie.  This is also confirmable by tracking network activity.

CLASS ACTION COMPLAINT

communications by or to, *inter alia*, Meta, Google, and Fullstory—unauthorized third-party eavesdroppers; and (c) undertook this pattern of conduct without notifying Plaintiff and Class Members and without obtaining their express written consent.

## I.    The Website Allowed the Interception of, and Otherwise Disclosed, Plaintiff's and Class Members' Private Information by and to Unauthorized Third Parties

85.    The Website is accessible on mobile devices and desktop computers, and UCSD Health encourages its patients to use the Website to schedule medical appointments, search for health care providers, research their symptoms or medical conditions and find treatment options, locate information about its medical facilities and the services offered at those facilities, register for online classes and events (such as tours for expectant parents), and more.

86.    The Website is undoubtedly used to communicate medical information in the course of seeking treatment, but Defendants nonetheless installed the Tracking Code and allowed the interception of, and otherwise disclosed, the Private Information of Plaintiff and Class Members with unauthorized third parties, including Meta, Google, and Fullstory.

87.    The Tracking Code tracks users as they navigate through the Website and simultaneously transmits to unauthorized third parties, including Meta, Google, and Fullstory, the users' communications made via the Website, including which pages are visited, which buttons are clicked, specific information users enter into search bars and text boxes (*e.g.,* "I have early onset dementia"), and other information including a patient's IP address.[60] On information and belief, the communications the unauthorized third parties received contained Private Information, including but not limited to, medical treatment sought, medical conditions, information pertaining to medical appointments and the selected physician, specific button/menu selections, and content (such as searches for symptoms or treatment options or queries like "Do I have

---

[60] https://developers.facebook.com/docs/meta-Analytics Code/.

CLASS ACTION COMPLAINT

COVID?") typed into free text boxes. This information was sent alongside individuals' PII, thereby allowing a particular individual's identity to be linked to their online activity and Private Information.

88.    As described by the HHS Bulletin, this is PHI even if the visitor has no previous relationship with UCSD Health because "the information connects the individual to the regulated entity (*i.e.*, it is indicative that the individual has received or will receive health care services or benefits from the covered entity), and thus relates to the individual's past, present, or future health or health care or payment for care."[61]

89.    Moreover, the UCSD Health acknowledged in an online data notice published on March 16, 2023 that the appointment scheduling software used by Plaintiff and Class Members on the Website disclosed "first and last name, date of birth, email address, IP address, third-party cookies, reason for visit, and insurance type (*e.g.*, PPO, HMO, Other)."[62] As noted by the HHS Bulletin this is PHI and written authorization is required to before any disclosure can be made:

> This information might include an individual's medical record number, home or email address, or dates of appointments, as well as an individual's IP address or geographic location, medical device IDs, or any unique identifying code. All such [information] collected on a regulated entity's website or mobile app generally is PHI.

## J.    Plaintiff's Experience

90.    Plaintiff John Doe is a UCSD Health patient and has used the Website for several years since early 2022. Plaintiff Doe routinely accesses the Website using the UCSD Health mobile application and has also used a website browser to access the Website. At UCSD Health's direction and encouragement, Plaintiff Doe used the

---

[61] *See* HHS Bulletin, § *How do the HIPAA Rules apply to regulated entities' use of tracking technologies?*, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.

[62] https://health.ucsd.edu/news/press-releases/2023-03-16-uc-san-diego-health-notifies-patients-of-vendor-data-collection-issue/

CLASS ACTION COMPLAINT

Website to, *inter alia*, to schedule medical appointments, obtain medications, obtain test results, research specialty doctors, and schedule imaging. Solely as an example, in 2022 and 2024 Plaintiff Doe used the Website to search for a neurologist to treat his concussion.

91.    Plaintiff Doe reasonably expected that his online communications with UCSD Health were confidential, solely between himself and UCSD Health, and that such communications would not be transmitted to or intercepted by a third party.

92.    Based on Defendants' integration, installation and embedding of the Tracking Code on the Website, Defendants allowed Plaintiff's Private Information (including, but not limited to, communications about his neurologist search) to be intercepted by, and otherwise disclosed to, unauthorized third parties, including Meta, Google, and Fullstory, without Plaintiff's knowledge or consent.

93.    Plaintiff submitted and communicated Private Information, including medical information, to UCSD Health via the Website. As a result of Defendants installing, integrating, and embedding the Tracking Code into the Website, those confidential and sensitive communications were intercepted by, and otherwise disclosed to, unauthorized and unknown third parties.

94.    Thus, among other things, Defendants aided and assisted third parties in intercepting Plaintiff's Private Information when he used the Website.

95.    This is precisely the type of information that HIPAA requires health care providers to anonymize to protect the privacy of patients. Plaintiff's and Class Members' identities could be easily determined based on the IP addresses and/or reverse lookup from the collection of other identifying information that was improperly disclosed.

96.    Through the process detailed in this Complaint, Defendants unlawfully assisted third parties with intercepting, and otherwise obtaining, Plaintiff's

CLASS ACTION COMPLAINT

communications without his knowledge, consent, or express written authorization, as well as breached confidentiality and Plaintiff's right to privacy.

**K.    Defendants' Conduct is Unlawful and Violated HIPAA Standards**

97.    Under federal law, a healthcare provider may not disclose personally identifiable, non-public medical information about a patient, a potential patient, or household member of a patient for marketing purposes without the patient's express written authorization.[63]

98.    The HIPAA Privacy Rule, located at 45 CFR Part 160 and Subparts A and E of Part 164, "establishes national standards to protect individuals' medical records and other individually identifiable health information (collectively defined as 'protected health information') and applies to health plans, health care clearinghouses, and those health care providers that conduct certain health care transactions electronically."[64]

99.    The Privacy Rule broadly defines PHI as individually identifiable health information ("IIHI") that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

100.    IIHI is defined as "a subset of health information, including demographic information collected from an individual" that is: (1) "created or received by a health care provider, health plan, employer, or health care clearinghouse"; (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual"; and (3) either (a) "identifies the individual" or (b) "[w]ith respect to which there is a

---

[63] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502, 164.508(a)(3), 164.514(b)(2)(i).

[64] HIPAA For Professionals, U.S. Dept. of Health & Hum. Servs., https://www.hhs.gov/hipaa/for-professionals/index.html.

27

reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

101.   Under the HIPPA de-identification rule, "health information is not individually identifiable only if": (1) an expert "determines that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "documents the methods and results of the analysis that justify such determination'"; or (2) "the following identifiers of the individual or of relatives, employers, or household members of the individual are removed;

   A. Names;

   ***

   H. Medical record numbers;

   ***

   J. Account numbers;

   ***

   M. Device identifiers and serial numbers;

   N. Web Universal Resource Locators (URLs);

   O. Internet Protocol (IP) address numbers; … and

   ***

   R. Any other unique identifying number, characteristic, or code…; and

   (ii) The covered entity does not have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information.

45 C.F.R. § 160.514(b)(2).

102.   The HIPAA Privacy Rule requires any "covered entity"—which includes health care providers—to maintain appropriate safeguards to protect the privacy of protected health information and sets limits and conditions on the uses and

disclosures that may be made of protected health information without authorization. 45 C.F.R. §§ 160.103, 164.502.

103.   An individual or corporation violates the HIPAA Privacy Rule if it knowingly and in violation of 42 U.S.C. §§ 1320d-1320d-9 ("Part C"): "(1) uses or causes to be used a unique health identifier; [or] (2) obtains individually identifiable health information relating to an individual." The statute states that a "person . . . shall be considered to have obtained or disclosed individually identifiable health information in violation of [Part C] if the information is maintained by a covered entity . . . and the individual obtained or disclosed such information without authorization." 42 U.S.C. § 1320d-6.

104.   The criminal and civil penalties imposed by 42 U.S.C. § 1320d-6 apply directly to a provider of healthcare, when it is knowingly disclosing individually identifiable health information relating to an individual, as those terms are defined under HIPAA.

105.   Violation of 42 U.S.C. § 1320d-6 is subject to criminal penalties. 42 U.S.C. § 1320d-6(b). There is a penalty enhancement where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." In such cases, the entity that knowingly obtains individually identifiable health information relating to an individual shall "be fined not more than $250,000, imprisoned not more than 10 years, or both."

106.   Defendants are employees of UCSD Health, a provider of healthcare. At UCSD Health's direction, Defendants implemented, installed, and/or embedded the Tracking Code on the Website for UCSD Health, and thus, their actions violated the HIPAA Rules. While there is no private right of action under HIPAA and these violations do not constitute a cause of action in and of themselves, the violation of the HIPAA Rules provides context for the elements of Plaintiff's and Class

CLASS ACTION COMPLAINT

members' underlying claims, including, inter alia: (1) the confidential nature of the information communicated to Defendant; (2) Plaintiff's and Class members' reasonable expectation of privacy in their confidential Private Information; (3) the highly offensive nature of Defendant's disclosure of Private Information; and (4) the fact that the Private Information communicated (including searches for specific symptoms, health conditions, or doctors, or the scheduling of appointments) constitutes the "contents" of the communication.

## DELAYED DISCOVERY RULE

107. Plaintiff did not discover that Defendants allowed the interception of, and otherwise disclosed his PHI and PII and confidential communications by and to unauthorized third parties, including Meta, Google, and Fullstory, until his retention of counsel around May 2025.

108. Plaintiff could not have made this discovery earlier because UCSD Health's use of the Tracking Code that enabled the Third Parties to intercept his PII and PHI was kept secret.

## CLASS ACTION ALLEGATIONS

109. Class Definition: Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this action on behalf of himself and other similarly situated individuals defined as all persons in the United States who, during the class period, had their Private Information improperly intercepted by, or otherwise disclosed to, third parties as a result of using the Website. Plaintiff reserves the right to modify the class definition or add sub-classes as necessary prior to filing a motion for class certification.

110. The "Class Period" is the time period beginning on the date established by the Court's determination of any applicable statute of limitations, after considering of any tolling, concealment, and accrual issues, and ending on the date of entry of judgement.

CLASS ACTION COMPLAINT

111.   Excluded from the Class are Defendants; anyone employed by counsel in this action; any judge to whom this case is assigned, his or her spouse and immediate family members; and members of the judge's staff.

112.   <u>Numerosity/Ascertainability</u>. Members of the Class are so numerous that joinder of all members would be unfeasible and not practicable. The exact number of Class Members is unknown to Plaintiff at this time. However, it is estimated that there are at least thousands of individuals in the Class. The identity of such membership is readily ascertainable from non-party records, such as those from UCSD Health, Meta, Google, and Fullstory.

113.   <u>Typicality</u>. Plaintiff's claims are typical of the claims of the Class because Plaintiff used the Websites and had his Private Information intercepted by, and otherwise disclosed to, third parties without Plaintiff's express written authorization or knowledge. Plaintiff's claims are based on the same legal theories as the claims of other Class Members.

114.   <u>Adequacy</u>. Plaintiff is fully prepared to take all necessary steps to represent fairly and adequately the interests of the Class Members. Plaintiff's interests are coincident with, and not antagonistic to, those of the Class Members. Plaintiff is represented by attorneys with experience in the prosecution of class action litigation generally and in the emerging field of digital privacy litigation specifically. Plaintiff's attorneys are committed to vigorously prosecuting this action on behalf of the Class Members.

115.   <u>Common Questions of Law and Fact Predominate/Well Defined Community of Interest</u>. Questions of law and fact common to the Class Members predominate over questions that may affect only individual Class Members because Defendants have acted on grounds generally applicable to the Class. Such generally applicable conduct is inherent in Defendants' wrongful conduct. The following questions of law and fact are common to the Class:

CLASS ACTION COMPLAINT

a. Whether Defendants intentionally tapped the lines of internet communication between patients and their medical providers;

b. Whether the Website surreptitiously tracks personally identifiable information, protected health information, and related communications and allows for the simultaneous interception and/or disclosure of that information to third parties;

c. Whether third party entities that received Private Information from the Tracking Code are third-party eavesdroppers;

d. Whether Defendants' conduct, as alleged herein, constitutes an affirmative act of communication;

e. Whether Defendants' conduct, which allowed third parties to intercept Plaintiff's and Class Members' Private Information, resulted in a breach of confidentiality;

f. Whether Defendants violated Plaintiff's and Class Members' privacy rights by using the Tracking Code to allow for the interception and disclosure of Plaintiff's and Class Members' Private Information by and to third parties;

g. Whether Plaintiff and Class Members are entitled to damages under the Federal Wiretap Act; and

h. Whether Defendants' actions violated Plaintiff's and Class Members' privacy rights under the California Constitution.

116.  Superiority. Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons a

CLASS ACTION COMPLAINT

method for obtaining redress on claims that could not practicably be pursued individually, substantially outweigh potential difficulties in management of this class action. Plaintiff is unaware of any special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

### CLAIMS FOR RELIEF

### COUNT I
**Violation Of The Federal Wiretap Act,**
**18 U.S.C. § 2510, *et seq.***

117.   Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein and brings this count individually and on behalf of the members of the Class.

118.   The Federal Wiretap Act, as amended by the Electronic Communications Privacy Act of 1986, prohibits the intentional interception of the contents of any wire, oral, or electronic communications through the use of a device. 18 U.S.C. § 2511.

119.   The Wiretap Act protects both the sending and receiving of communications.

120.   18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

121.   The transmissions of Plaintiff's Private Information to the Website qualifies as a "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

122.   **Electronic Communications.** The transmission of Private Information between Plaintiff and Class members and UCSD Health, with which they chose to exchange communications, are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate

CLASS ACTION COMPLAINT

commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

123.    **Content.** The ECPA defines content, when used with respect to electronic communications, to "include [] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

124.    **Interception.** The ECPA defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents…include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

125.    **Electronic, Mechanical, or Other Device.** The ECPA defines "electronic, mechanical, or other device" as "any device…which can be used to intercept a[n]…electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

Plaintiff's and Class members' browsers;

a.    Plaintiff's and Class members' computing devices;

b.    UCSD Health's webservers; and

c.    The Tracking Code deployed by Defendants to effectuate the sending and acquisition of patient communications.

126.    By utilizing and embedding the Tracking Code on the Website, Defendants intentionally intercepted, endeavored to intercept, and procured another person to intercept, the electronic communications of Plaintiff and Class members, in violation of 18 U.S.C. § 2511(1)(a).

127.    Specifically, through Defendants' action of embedding the Tracking Codeon the Website, which Defendants knew would track, store, and unlawfully transmit Plaintiff's and Class members' PII to Meta, Google, Fullstory, and other

34

third parties, Defendants procured the Third Parties to intercept Plaintiff's and Class members' electronic communications. *See* 18 U.S.C. § 2511(1)(a).

128.    The communications Defendants allowed to be intercepted include, but are not limited to, communications to/from Plaintiff and Class members regarding Private Information, treatment, medication, and scheduling.

129.    By intentionally disclosing or endeavoring to disclose the electronic communications of the Plaintiff and Class members to the Third Parties, in the manner alleged herein, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendants violated 18 U.S.C. § 2511(1)(c).

130.    By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiff and Class members for analytics and marketing purposes, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendants violated 18 U.S.C. § 2511(1)(d).

131.    **Unauthorized Purpose.** Defendants intentionally intercepted, and procured the Third Parties to intercept or endeavor to intercept, the contents of Plaintiff's and Class members' electronic communications for the purpose of committing a tortious act in violation of the California Constitution or laws of the United States or of any State – namely, invasion of privacy under the California Constitution, and a violation of HIPAA as described herein.

132.    Defendants intentionally used the wire or electronic communications to increase profit margins for UCSD Health. For instance, Defendants specifically used the Tracking Code to track and utilize Plaintiff's and Class members' Private Information for UCSD Health's financial gain including but not limited to using the tracked Private Information to target Plaintiff and Class members with

CLASS ACTION COMPLAINT

advertisements on Facebook and other third-party platforms for marketing and retargeting purposes.

133.   Defendants were not acting under color of law to intercept or procure the Third Parties to intercept or endeavor to intercept, Plaintiff and the Class member's wire or electronic communications.

134.   Plaintiff and Class members did not authorize Defendants to acquire the content of their communications for purposes of invading Plaintiff's privacy by transmitting their Private Information via the Tracking Code or any other third-party platforms.

135.   Any purported consent that Defendants received from Plaintiff and Class members was not valid.

136.   In transmitting, acquiring, and procuring the Third Parties to intercept or endeavor to intercept the content of Plaintiff's and Class members' communications relating to the browsing of the Website, Defendants' purpose was tortious, criminal, and designed to violate federal and state legal provisions, including as described above the following: (1) a knowing intrusion into a private, place, conversation, or matter that would be highly offensive to a reasonable person; and (2) violations of HIPAA.

## COUNT II
### Invasion Privacy Under California's Constitution

137.   Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the proposed Class and Subclass.

138.   Plaintiff and Class Members have an interest in: (1) precluding the dissemination and/or misuse of their sensitive, confidential communications about their PHI and PII; and (2) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to,

CLASS ACTION COMPLAINT

the right to visit and interact with various internet sites without being subjected to wiretaps without Plaintiff's and Class Members' knowledge or consent.

139.   At all relevant times, by installing and embedding the Tracking Code into the Website so that the Third Parties could intercept users' private communications with UCSD Health, Defendants intentionally invaded Plaintiff's and Class Members' privacy rights under the California Constitution by enabling the interception and disclosure of their private information.

140.   Plaintiff and Class Members had a reasonable expectation that their communications involving their PHI and PII would remain confidential and that Defendants, their healthcare provider's employees, would not enable third parties' interception of this sensitive information given that Defendants did not provide Plaintiff and Class Members with notice of their practice of disclosures.

141.   Plaintiff and Class Members did not authorize Defendants to record and transmit Plaintiff's and Class Members' private communications involving their PHI and PII.

142.   This invasion of privacy is highly offensive and serious in nature, scope, and impact because it relates to patients' private PHI and PII communications. Moreover, it constituted an egregious breach of the societal norms underlying the privacy right.

143.   Accordingly, Plaintiff and Class Members seek all relief available for invasion of privacy claims under California's Constitution.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

      a.  For a determination that this action is a proper class action;

      b.  For an order certifying the Class, naming Plaintiff as representative of the Class, and naming Plaintiff's attorneys as Class Counsel to represent the Class and Subclass;

CLASS ACTION COMPLAINT

c.  For an order declaring that Defendants' conduct violates the statutes and laws referenced herein;

d.  For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

e.  For an award of compensatory damages, including statutory damages where available, to Plaintiff and the Class against Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial;

f.  For punitive damages, as warranted, in an amount to be determined at trial;

g.  For an order requiring Defendants to disgorge revenues and profits wrongfully obtained;

h.  For prejudgment interest on all amounts awarded;

i.  For injunctive relief as pleaded or as the Court may deem proper;

j.  For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit; and

k.  For an order granting Plaintiff and the Class such further relief as the Court deems appropriate.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff on behalf of himself and the proposed Class, demands a trial by jury for all of the claims asserted in this Complaint so triable.

Dated: September 16, 2025                 Respectfully submitted,

                                          **BURSOR & FISHER, P.A.**

                                          By:    _/s/ Philip L. Fraietta_____
                                                    Philip L. Fraietta

38

CLASS ACTION COMPLAINT

Philip L. Fraietta (State Bar No. 354768)
*pfraietta@bursor.com*
**BURSOR & FISHER, P.A.**
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: 914.874.0708
Facsimile: 914.206.3656

L. Timothy Fisher (State Bar No. 191626)
*ltfisher@bursor.com*
Ines Diaz Villafana (State Bar No. 354099)
*idiaz@bursor.com*
**BURSOR & FISHER, P.A.**
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: 925.300.4455
Facsimile: 925.407.2700

Scott R. Drury (State Bar No. 355002)
*scott@drurylegal.com*
**DRURY LEGAL, LLC**
6 Carriage Lane
Highwood, Illinois 60040
Telephone: 312.358.8225

John J. Nelson (State Bar No. 317598)
*jnelson@milberg.com*
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
402 W. Broadway, Suite 1760
San Diego, CA 92101
Telephone: 858.209.6941

Bryan L. Bleichner (State Bar No. 220340)
*bbleichner@chestnutcambronne.com*
**CHESTNUT CAMBRONNE PA**
100 Washington Avenue South, Suite 1700
Minneapolis, MN 55401
Phone: 612.339.7300
Fax: 612.336.2940

Spencer Campbell*
*scampbell@msdlegal.com*
**MARKOVITS, STOCK & DEMARCO,
LLC**
119 E. Court St., Suite. 530
Cincinnati, OHIO 4502

39

Phone: 513.651.3700
Fax: 513.665.0219

Joseph M. Lyon*
jlyon@thelyonfirm.com
**THE LYON FIRM**
2754 Erie Ave.
Cincinnati, Ohio 45208
Telephone: 513.381.2333
Facsimile: 513.766.9011

Caleb Marker (SBN 269721)
caleb.marker@zimmreed.com
**ZIMMERMAN REED LLP**
6420 Wilshire Blvd., Suite 1080
Los Angeles, CA 90048
Telephone: 877.500.8780
Facsimile: 877.500.8781

Christopher D. Jennings*
chris@jefirm.com
Winston Hudson*
winston@jefirm.com
**JENNINGS & EARLEY PLLC**
500 President Clinton Avenue, Suite 110
Little Rock, Arkansas 72201
(501) 255-8569

Rachel K. Tack*
rachel.tack@zimmreed.com
**ZIMMERMAN REED LLP**
1100 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone: 612.341.0400
Facsimile: 612.341.0844

***Counsel for Plaintiff and the Putative Class***
*\* pro hac vice applications forthcoming*

CLASS ACTION COMPLAINT